IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

CAROLYN A. BROWNLEE,           )
                               )
        Plaintiff,             )
                               )
vs.                            )CIVIL ACTION NO. 04-00487-CB-B
                               )
JO ANNE B. BARNHART,           )
Commissioner of                )
Social Security,               )
                               )
        Defendant.             )

## REPORT AND RECOMMENDATION

Plaintiff Carolyn A. Brownlee ("Plaintiff") brings this action seeking judicial review of a final decision of the Commissioner of Social Security denying her claim for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act, (hereinafter "the Act"), 42 U.S.C. §§ 401-433 and 1381-1383c. This action was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). Oral argument was held on August 2, 2005. Upon careful consideration of the administrative record, oral argument and the memoranda of the parties, it is recommended that the decision of the Commissioner be **AFFIRMED.**

## I.   Procedural History

On December 13, 2001, Plaintiff protectively filed an application for disability insurance benefits and supplemental security income, alleging that she has been disabled since

September 8, 2000 due to depression, nervousness, being a slow learner, seizures, arthritis, leg pain and back pain. (Tr. 84-87, 288-293). On May 21, 2002, Plaintiff's applications[1] were denied and on July 20, 2002 she filed a Request for Hearing before an Administrative Law Judge (hereinafter "ALJ"). (Id. at 54-59, 70-79, 292-298). On April 23, 2003, ALJ Ricardo M. Ryan, (hereinafter "ALJ Ryan"), conducted an administrative hearing which was attended by Plaintiff and her representative. (Id. at 29-53). ALJ Ryan, on July 21, 2003, entered an unfavorable decision wherein he found that Plaintiff has the severe impairments of depression, asthma and arthritis, but that her impairments, when considered individually and in combination, do not meet or medically equal a Listing, or functionally equal in severity an impairment set forth in the Listing. (Id. at 15-26). Plaintiff's August 20, 2003 request for review of this decision was denied on June 4, 2004, making the ALJ's decision the final decision of the Commissioner. (Id. at 5-9). The parties agree that this case is now ripe for judicial review and

---

[1]Plaintiff filed previous applications for social security benefits on October 5, 2000. (Tr. 54-57, 80-83). On February 2, 2001, these applications were denied at the initial level by the Disability Determination Service ("DDS"). (Id.) Plaintiff's application was treated as a prototype determination and the reconsideration step was eliminated. 20 C.F.R. §§ 404.906 and 416.1406. Plaintiff did not appeal this prior denial of her October 2000 applications. (Tr. 15).

is properly before this Court pursuant to 42 U.S.C. §§ 405(g) and 1383 (c)(3).

## II. __Factual Background__

Plaintiff was born on February 12, 1949 in Chastain, Alabama and was 54 years old at the time of the administrative hearing. (Tr. 32). Plaintiff is 5'5½" and weighs around 160 pounds. (Id.) Plaintiff has a ninth-grade education and obtained a GED. (Id. at 35-36). Plaintiff testified that she is separated from her husband, and that she resides alone, except for a nephew who is often away at college. (Id. at 34, 47).

Plaintiff also testified that she served in the Air Force for approximately seven or eight months in 1974-1975. (Id. at 46-47). According to Plaintiff, she was employed from 1988 to 2000-2001, inspecting Christmas paper for Cleo Wrap in Memphis, Tennessee. (Id. at 37-38, 40). Plaintiff testified that she left this position because she feared being terminated and losing her pension. (Tr. 37-42). Plaintiff explained that she was taking medicine, which made her sick, and in turn resulted in her getting written up and suspended. (Id. at 37). Thus, to protect her pension, she resigned. (Id. at 37-42).

Regarding her daily activities, Plaintiff testified that she typically sits at home and watches TV. (Id. at 49). According to Plaintiff, she cleans her own apartment, but her sister

washes her clothes because she does not have a washing machine, and brings her groceries because she does not have transportation. (Id. at 47-49).  Plaintiff also testified that she shops approximately once a month, and that she is able to prepare meals; however, her sister cooks for her because she forgets and leaves pots on the stove.   (Id. at 48-50). Plaintiff testified that she does not go to church, and is not good around people; however, she does visit with her mother. (Tr. 48-49).  Plaintiff also acknowledged that she knows how to pay bills, handles money, has her own checking account and writes out her own checks.  (Id. at 37).

Plaintiff testified that she suffers from "[d]epression, [bad] nerves and arthritis[]" and that the arthritis "moves around[]" in her knees, arms, wrists and hip.  (Id. at 44-45). According to Plaintiff, she takes medication because she hears voices and for her depression, and she receives treatment at the Veteran's Administration (hereinafter "VA"), and from Dr. Dickerson.  (Id. at 44-46).  Plaintiff testified that she tried to commit suicide three times in the past, but has not tried lately; however, she has thought about it.  (Id. at 51). Plaintiff takes antidepressants, namely Prozac[2] and Risperdal.[3]

---

[2]Prozac, also known as Fluoxetine, is in a class of medicines called selective serotonin reuptake inhibitors (SSRIs) and is used to treat Depression, Obsessive-Compulsive Disorder (OCD), Bulemia

(<u>Id</u>. at 51-52).

After considering all of the evidence of record, the ALJ determined that Plaintiff has not engaged in substantial gainful activity since her alleged onset of disability, September 8, 2000. (Tr. 26, Finding 2). The ALJ further determined that Plaintiff has the impairments of depression, asthma and arthritis, which are "severe" within the meaning of the Act. (<u>Id</u>., Finding 3). Next, the ALJ concluded that Plaintiff does not have an impairment or combination of impairments which meet, medically equal or functionally equal the criteria for any of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, Reg. No. 4, including Listing 12.04 contained therein. (<u>Id</u>., Finding 4). The ALJ determined that Plaintiff retains the residual functional capacity to perform medium unskilled work activity and that her past relevant work as an inspector/packer

---

Nervosa, and Panic Disorder, among other things. <u>See</u> <u>www.fda.gov</u> (last visited September 21, 2005). This medication works by restoring the balance of natural substances (neurotransmitters) in the brain, thereby improving mood and feelings of well-being. <u>See</u> <u>www.webmd.com</u> (last visited September 21, 2005).

[3]Risperdal is in a class of medications called atypical antipsychotics which are used to treat symptoms of schizophrenia that may include hearing voices, seeing things, or sensing things that are not there, mistaken beliefs or unusual suspiciousness. <u>See</u> <u>www.fda.gov</u> (last visited September 21, 2005). This medication works by helping to restore the balance of certain natural substances in the brain (neurotransmitters); it has not been shown to be safe or effective in the elderly for the treatment of delusions or hallucinations (psychosis) due to dementia. <u>See</u> <u>www.webmd.com</u> (last visited September 21, 2005).

does not require the performance of work-related activities
precluded by same. (Id., Findings 5 and 7). The ALJ also found
that Plaintiff's assertions relative to symptomatology,
functional limitations and restrictions of activities of daily
living, lack corroboration or substantiation in the medical
evidence and are not credible as to a disabling impairment.
(Id., Finding 6). The ALJ concluded that Plaintiff can return
to her past relevant work and is therefore not disabled. (Id.,
Finding 8).

## III. Issue On Appeal

Whether the ALJ erred by "flouting Social Security Ruling
96-2p"[4] in failing to give controlling weight to the medical
opinions of Plaintiff's treating physicians at the Veteran's
Administration, who for years diagnosed her with "major
depression with psychotic features, recurrent" such that she
meets the provisions of 20 C.F.R. Part 404, Subpart P, Appendix
1, Regulation No. 4, Section 12.04 Affective Disorders?

## IV. Analysis

### A. Standard of Review

In reviewing claims brought under the Act, this court's role
is a limited one. The court's review is limited to determining

---

[4]Social Security Ruling 96-2p, Title II and Title XVI: Giving
Controlling Weight to Treating Source Medical Opinions. See, e.g.,
Blake v. Massanari, 2001 WL 530697, *10 (S.D. Ala. Apr. 26, 2001).

1) whether the decision of the Secretary is supported by substantial evidence, and 2) whether the correct legal standards were applied. <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 (11th Cir. 1990).[5] A court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. <u>Sewell v. Bowen</u>, 792 F.2d 1065, 1067 (11th Cir. 1986). The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. <u>Brown v. Sullivan</u>, 921 F.2d 1233, 1235 (11th Cir. 1991); <u>Bloodsworth v. Heckler</u>, 703 F.2d 1233, 1239 (11th Cir. 1983) (holding that substantial evidence is defined as "more than a scintilla but less than a preponderance," and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion[]"). In determining whether substantial evidence exists, the court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's decision. <u>Chester v. Bowen</u>, 792 F. 2d 129, 131 (11th Cir. 1986); <u>Short v. Apfel</u>, 1999 U.S. Dist. Lexis 10163 (S.D. Ala. 1999).

**B.  <u>Discussion</u>**

An individual who applies for Social Security disability

_____

[5]This court's review of the Commissioner's application of legal principles is plenary. <u>Walker v. Bowen</u>, 826 F.2d 996, 999 (11th Cir. 1987).

benefits must prove her disability.  See 20 C.F.R. § 404.1512;

20 C.F.R. § 416.912.  Disability is defined as the "inability to

do any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected

to result in death or which has lasted or can be expected to

last for a continuous period of not less than twelve months."

42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a); 20 C.F.R. §

416.905(a).

     The  Social  Security  regulations  provide  a  five-step

sequential evaluation process for determining if a claimant has

proven her disability.  See 20 C.F.R. § 404.1520; 20 C.F.R. §

416.920.[6]  In the case sub judice, the ALJ applied the five-step

---

[6]The claimant must first prove that he or she has not engaged in
substantial gainful activity.  The second step requires the claimant
to prove that he or she has a severe impairment or combination of
impairments. If, at the third step, the claimant proves that the
impairment or combination of impairments meets or equals a listed
impairment, then the claimant is automatically found disabled
regardless of age, education, or work experience.  If the claimant
cannot prevail at the third step, he or she must proceed to the
fourth step where the claimant must prove an inability to perform
their past relevant work.  Jones v. Bowen, 810 F.2d 1001, 1005 (11th
Cir. 1986).  In evaluating whether the claimant has met this burden,
the examiner must consider the following four factors: (1) objective
medical facts and clinical findings; (2) diagnoses of examining
physicians; (3) evidence of pain; (4) the claimant's age, education
and work history.  Id. at 1005.  Once a claimant meets this burden,
it becomes the Commissioner's burden to prove at the fifth step that
the claimant is capable of engaging in another kind of substantial
gainful employment which exists in significant numbers in the
national economy, given the claimant's residual functional capacity,
age, education, and work history.  Sryock v. Heckler, 764 F.2d 834
(11th Cir. 1985).  If the Commissioner can demonstrate that there are
such jobs the claimant can perform, the claimant must prove inability

process in evaluating Plaintiff's claim, and as noted <u>supra</u>, he determined that she retained the residual functional capacity to perform medium unskilled work activity, and could return to her past relevant work as an inspector/packer. (Tr. 26, Findings 5, 7). Plaintiff argues that the ALJ erred because he failed to give controlling weight to the opinions of her treating physicians at the Veterans Administration (hereinafter "VA"), who "for years diagnosed [her with] major depression with psychotic features, recurrent[,]" such that she meets the provisions of Listing 12.04 Affective Disorders, Pt. 404, Subpart, P, App. 1. (Doc. 6).

As a preliminary matter, the undersigned observes that Plaintiff's brief is woefully inadequate. The brief does not contain any record citations; thus, the Court is left to speculate about the specific record evidence that Plaintiff is relying upon to support her argument. Additionally, Plaintiff's brief is totally devoid of any case law. It is neither incumbent on this Court to scour the record in search of supporting evidence for Plaintiff's claim – which may or may not be buried in the record – nor is it the job of this Court to

---

to perform those jobs in order to be found disabled. <u>Jones v. Apfel</u>, 190 F.3d 1224, 1228 (11th Cir. 1999). <u>See</u> <u>also</u> <u>Hale v. Bowen</u>, 831 F.2d 1007, 1011 (11th Cir. 1987) (citing <u>Francis v. Heckler</u>, 749 F.2d 1562, 1564 (11th Cir. 1985)).

engage in any exercise which requires speculation or conjecture about a party's argument.[7] Courts in the Eleventh Circuit have made clear that it is not a court's job to wade through evidence.  Notwithstanding the problems with Plaintiff's brief, the undersigned has carefully reviewed the medical evidence and concludes that the ALJ's decision is supported by substantial evidence.

Specifically, the record evidence reflects that Plaintiff was seen at the VA Medical Center in Memphis, Tennessee, on

---

[7]See, e.g., Johnson v. Shoney's, Inc., Slip Copy 2005 WL 2007236, *5 (M.D. Ga. Aug. 18, 2005) (refusing to "cull" through depositions and other evidence in support of a party's claim because a court has no duty to "ferret out evidence"); Selma Housing Development Corp. v. Selma Housing Auth., Slip Copy 2005 WL 1981290, *12 n. 30 (S.D. Ala. Aug. 16, 2005) (noting that judges have no duty to scour the record when a party fails to provide sufficient support for a claim); Garrison v. Travel Centers of America, Slip Copy, 2005 WL 1711884, *3 n. 12 (S.D. Ala. July 20, 2005) (same); Belt v. Alabama Historical Commission, Slip Copy 2005 WL 1653728, *2 n. 6 (S.D. Ala. July 12, 2005) (same); Witbeck v. Embry Riddle Aeronautical University, Inc., 219 F.R.D. 540, 547-548 (M.D. Ala. 2004) (holding that the rule that judges have no duty to scour the file in search of evidence is an obvious corollary to the requirement that parties specifically identify the portions of the case file which support their assertions); Tomasini v. Mount Sinai Medical Center of Florida, Inc., 315 F. Supp. 2d 1252, 1260 n. 11 (S.D. Fla. 2004) (same); Lawrence v. Wal-Mart Stores, Inc., 236 F. Supp. 2d 1314, 1322 (M.D. Fla. 2002) (same).  See also Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 672 (10th Cir. 1998) (finding that federal courts "are wary of becoming advocates who comb the record of previously available evidence and make a party's case for it"); Nicholas Acoustics & Specialty Co. v. H & M Const. Co., 695 F.2d 839, 846-47 (5th Cir. 1983) (stating that "[j]udges are not ferrets[]" and "practical constraints on the time of a judge make it impossible for the judge to examine a record of even moderate size with such finitude as to be both exhaustive and exhausting").

August 3, 1999. (Tr. 191-194). The notes reflect that Plaintiff had not been seen in the mental health clinic or been "prescribed any psychotropic medication since late 1997." (Id. at 193). On August 24, 1999, Plaintiff's Global Assessment of Function ("GAF") score was assessed to be 50, she was diagnosed with mood disorder-depression, and provided a prescription. (Id. at 190). During an October 26, 1999 visit to the VA, Plaintiff requested, and was permitted to have, her prescription changed to Prozac. (Id. at 189). Nearly nine months later, Plaintiff visited the VA on July 10, 2000, and it was noted that she had been out of her medications for several months. (Id. at 188). Her GAF score was assessed to be 45, and she was instructed to return to the clinic in six months. (Id.) During a return visit to the VA on September 27, 2000, x-rays of Plaintiff's left knee were normal. (Tr. 195-196).

A year later, Plaintiff was seen at the VA center in Biloxi, Mississippi, on October 16, 2001 by Randal Caffarel, M.D., (hereinafter "Dr. Caffarel"), a VA psychiatrist. (Id. at 235). Plaintiff reported that she had been taking her medications as prescribed, which were "mostly effective" without side effects, and that she was doing "relatively good" and her overall mood was "ok." (Id.) Dr. Caffarel observed Plaintiff

was "fully oriented," her mood was "euthymic,"[8] she showed "no evidence of psychoses," her intelligence was estimated as average, and she denied suicidal/violent thoughts as well as alcohol/drug abuse. (Id.) Dr. Caffarel diagnosed Plaintiff with "a history of major depression with psychotic features and a rule out diagnosis of schizophrenia . . . .[,]" and listed her GAF to be 50. (Id.) Dr. Caffarel refilled her medications and scheduled her for a follow-up appointment on December 4, 2001 (which she later failed to attend). (Id. at 234-235).

Nearly a year later, Plaintiff was treated on July 30, 2002 at the VA center in Biloxi, Mississippi, by Nathaniel Abston, Jr., Ph.D, (hereinafter "Dr. Abston"), a VA psychologist. (Tr. 283-284). Dr. Abston's notes reflect that Plaintiff complained of depression, auditory hallucinations and erratic sleep patterns. (Id. at 284). Plaintiff initially indicated that she had not heard voices in two months and that she had been out of her psychotropic medications for two weeks. (Id.) Plaintiff then clarified that she only hears voices when she is out of her medication. (Id.) Dr. Abston found no evidence of delusions, ideas of reference, obsessions, compulsions, illusions or anxiety, and estimated that Plaintiff's intelligence was in the

---

Meaning mental peace and tranquility. See www.biology-online.org (last visited September 21, 2005).

12

low-average range.   (<u>Id</u>. at 283).   Dr. Abston diagnosed
Plaintiff with major depression, recurrent, severe, with
psychotic features, placed her GAF score at 45, and advised her
to continue taking her medication and to return for appropriate
psychotherapy.  (<u>Id</u>.)

Plaintiff was next treated at the VA center on November 20,
2002 for a scheduled appointment for treatment of her depressive
disorder.   (Tr. 282).   At that time, it was noted that
Plaintiff's affect was blunted; her mood was pretty good but was
incongruent with her presentation; her thoughts, while seemingly
slowed, were coherent and goal directed; she described unusual
sensory perceptual experiences and reported hearing voices (like
someone asking her question but does not hear voices when her
television is off); and she denied visual hallucinations.  (<u>Id</u>.)
Plaintiff reported that there were many nights when she would
try to fall asleep but would feel a presence get into her bed
and is certain this causes her bed to move.  (<u>Id</u>.)  Plaintiff
also reported good adherence to her prescribed Prozac and
Risperdal, but stated that the Risperdal was not working like it
used to as it was not helping with her sleep disturbances.
(<u>Id</u>.)  Plaintiff denied current suicidal/homicidal ideation and
stated that she was nearly out of medications and continues to
experience significant sleep disturbances marked by frequent

night terrors and extreme difficulty falling asleep. (Id.) Plaintiff stated that she has low energy, poor concentration, weight gain, constant fatigue and was in a depressed mood most of nearly everyday and that she was not actively searching for work and could not tolerate changes in a work routine, noting significant confusion and distress. (Id.) Plaintiff was diagnosed with major depression, recurrent, severe with psychotic features. (Tr. 282).

Plaintiff received additional treatment at the VA center on December 6, 2002. (Id. at 280-281). Dr. Abston's treatment notes reflect that Plaintiff reported that she was nearly out of her medication, she did not hear voices when her television was turned off and that she had received "good results" with her medications without experiencing any adverse side effects. (Id.) Dr. Abston observed that Plaintiff was fully oriented, her thought process was logical and she showed no evidence of psychoses. (Id.) Dr. Abston diagnosed Plaintiff with major depression, recurrent, with psychotic features and an upper respiratory tract infection, her GAF was placed at 50, her pharmacological regimen was altered and she was instructed to return for appropriate therapy. (Id. at 280).

Plaintiff returned to the VA for treatment on April 28, 2003. (Id. at 278-279). At the time, Plaintiff reported to Dr.

Abston that she took her medications as prescribed, that she had received "somewhat better results" and that she had experienced no side effects. (Tr. 279). Plaintiff also reported impaired sleep, variable energy and a diminished ability to concentrate. (Id. at 278-279). Dr. Abston found the results of Plaintiff's exam were "practically unchanged" in comparison to her December 2002 exam, he slightly altered her medications and advised her to return in three months. (Id.)

The record evidence also reflects that Plaintiff underwent a consultative psychological evaluation conducted by Michael Guinle, Ph.D, (hereinafter "Dr. Guinle"), on December 4, 2000. (Id. at 197-200). Plaintiff complained about depression and alleged that she "may have had a nervous breakdown sometime in the 1980." (Id. at 197). Plaintiff reported "previous suicidal ideation," but denied any current thoughts of harming herself. (Id. at 198). Plaintiff also reported sleeping difficulties, being nervous around people, having a poor memory, and feeling that someone is "sitting on her bed." (Tr. 198). Plaintiff also indicated that she does her own grooming and cleans the house, that her stepmother performs her household chores and cooks and shops for her as well, and that a friend pays her bills. (Id.) Plaintiff also reported that she gets along with her stepmother, but does not associate with other members of her

15

family, and does not have friends. (Id. at 198-199). Dr.
Guinle observed that Plaintiff cried "a couple of times" during
the interview, and that while she was alert and fully oriented,
her effort was only "fair" and her attention and concentration
were diminished. (Id. at 199). Dr. Guinle diagnosed Plaintiff
with major depression, and recommended that she receive "a more
intensive counseling program." (Id. at 200). He also opined
that her abilities to understand and remember, as well as to
sustain concentration and persistence, social interaction and
adaption skills, appear slightly limited given her depressed
moods. (Id.)

Barry R. Siegel, M.D., (hereinafter "Dr. Siegel"), a board-
certified internist, conducted a consultative examination of
Plaintiff on January 17, 2001. (Tr. 219-224). Plaintiff
complained of depression and reported that she was hospitalized
for a nervous breakdown in approximately 1980. (Id. at 219).
Dr. Siegel observed that Plaintiff had a "blunted affect," and
diagnosed her with a history of psychiatric impairment, rule out
somatoform disorder. (Id. at 220). He opined that she had "no
impairment related physical limitations." (Id.)

Plaintiff also underwent a consultative physical
examination conducted by Ilyas A. Shaikh, M.D., (hereinafter
"Dr. Shaikh"), a neurologist, on March 28, 2002. (Id. at 237-

16

240).   Plaintiff complained of multiple joint pains and depression.   (<u>Id</u>. at 237).   Dr. Shaikh diagnosed Plaintiff with arthritis and depression.   (Tr. 239).   With respect to her arthritis, Dr. Shaikh noted that her symptoms are stable now, but may be exacerbated with cold weather.   (<u>Id</u>.)   He also noted that Plaintiff appeared depressed, and that she is fairly stable with her current antidepressants.   (<u>Id</u>.)

Plaintiff underwent a consultative psychological examination by Gerald E. McCleary, Ph.D., (hereinafter "Dr. McCleary"), a psychologist, on April 13, 2002.   (<u>Id</u>. at 241-243).   Plaintiff complained of "nerves and depression[,]" and stated that she had been depressed her entire life with everything and everybody in the home.   (<u>Id</u>. at 241).   Plaintiff also reported that she has problems with her sleep because she hears voices and sees people in her room when she falls asleep.   (<u>Id</u>. at 242).   She also indicated that her appetite is so-so, she is independent in her daily activities, and she does not attend church or belong to any social organizations.   (Tr. 242).

Dr. McCleary observed that Plaintiff's affect was stable; her mood was blunted; her thinking was clear and coherent, without evidence of confusion; she denied any current suicidal thoughts but  reported she had attempted to overdose two to three years ago;  there was no evidence of delusional ideation;

and she was able to follow simple and complex verbal instructions. (Id. at 242). He questioned Plaintiff's motivation and effort, based on testing results which suggested malingering, and as a result, opined that the evaluation was an underestimate of Plaintiff's current level of functioning. (Id. at 242-243). Dr. McCleary concluded that "based on her history and current presentation it appears that she has a Personality Disorder with borderline traits." (Id. at 243). Dr. McCleary noted that Plaintiff did not appear to be actively psychotic at that time and that her "'hallucinations'" appeared to be dreams." (Id.)

Donald E. Hinton, Ph.D., (hereinafter "Dr. Hinton"), completed a mental residual functional capacity assessment on Plaintiff on June 4, 2002, and concluded that she had no significant limitations in the vast majority of her abilities and was only moderately limited in her abilities to understand, remember and carry out detailed instructions, maintain attention and concentration for extended periods, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, respond appropriate to changes in the work setting, set realistic goals; and make plans independently of others. (Id. at 252-255). Dr. Hinton also completed a psychiatric review technique form on Plaintiff

on this same day, and concluded that while she suffers from depression, her impairment does not precisely satisfy the diagnostic criteria for Listing 12.04 Affective Disorders. (Tr. 256-269). In so doing, he found that Plaintiff has a mild degree of limitation with restriction of activities of daily living; moderate limitations with difficulties in maintaining social functioning and maintaining concentration, persistence or pace; and insufficient evidence of episodes of decompensation, each of extended duration. (Id.) Dr. Hinton concluded that the evidence did not establish the presence of the Listing 12.04 criteria for Plaintiff. (Id. at 267).

John W. Davis, M.D., (hereinafter "Dr. Davis"), a psychologist conducted a consultative examination of Plaintiff on November 19, 2002.[9] (Id. at 270-273). Plaintiff reported to Dr. Davis that she is disabled due to depression, and that she has been treated several times in the past for her depression. (Id. at 270). Plaintiff stated that she was currently taking Prozac, and it helps her to feel better. (Id.) Plaintiff also reported problems with arthritis. (Tr. 270). Dr. Davis

---

[9]Dr. Davis has also previously completed a Medical Source Opinion Form (Mental) on Plaintiff on December 19, 2001 (which is marked as received on December 9th and 11th, 2002), at which time he determined that Plaintiff was only mildly limited in her ability to respond appropriately to others, deal with changes in a routine work setting, understand simple instructions, maintain attention and social functioning and perform daily activities. (Id. at 274-275).

19

observed that Plaintiff's mood was depressed, she showed no abnormalities with respect to her communication; she was oriented to person, place and time; she had no problems with concentration or attention, except that over medication was suspected; overall, her thought processes were simple and limited; there was no indication of any hallucinations or delusions or other circumstances of perceptual disturbance; and her insight and judgment were somewhat impaired due to her self-centered nature.  (Id. at 271-272).  Dr. Davis diagnosed depression, NOS, with some malingering (based on repeated random responses to the Minnesota Multiphasic Personality Inventory test), and opined that it was reasonable to expect a favorable response to treatment within the next six to twelve months. (Id. at 273).  Dr. Davis further opined that Plaintiff could return to work.  (Id.)  According to Dr. Davis, Plaintiff can do simple, routine, repetitive work as well as get along with others.  (Id. at 273).

In his decision, the ALJ reviewed and thoroughly discussed the above-referenced medical evidence, including the treatment records from the VA.  While Plaintiff contends that the ALJ did not give appropriate weight to the opinions of her treating doctors at the VA, the record reflects otherwise.  A treating physician's testimony must be given substantial weight unless

"good cause" is shown to the contrary.   Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1159-1160 (11th Cir. 2004); Phillips v. Barnhart, 357 F.3d 1232, 1240 (11th Cir. 2004); Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997); Hillsman v. Bowen, 804 F.2d 1179, 1181-1182 (11th Cir. 1986).   "[G]ood cause exists when the (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."   Phillips, 357 F.2d at 1240-41.   In contrast, good cause "is not provided by the report of a nonexamining physician where it contradicts the report of the treating physician."   Lamb v. Bowen, 847 F.2d 698, 703 (11th Cir. 1988).

In the case sub judice, the record demonstrates that the ALJ gave considerable weight to the opinions of Plaintiff's treating physicians at the VA.   First of all, none of Plaintiff's treating physicians opined that she was disabled, nor did any of them assign Plaintiff any functional limitations.   See supra. As noted by the ALJ, Dr. Caffarel's treatment notes reflect that Plaintiff was fully oriented, her mood was euthymic and she showed no evidence of psychosis.   (Tr. 20).   Moreover, Plaintiff reported that she was doing relatively good and that her overall mood was okay.   See supra.   Similarly, Dr. Abston's notes from

the VA reflect that Plaintiff received good results when she took her medication.  Id. She was fully oriented, her thought processes were logical, and she showed no evidence of psychoses. Id.

Second, in his decision, the ALJ concluded, as opined by the VA doctors, that Plaintiff suffered from depression.  (Tr. 23).  While he did not, however, accept their assertion that Plaintiff had psychotic features, his rejection of this portion of their findings is supported by substantial evidence.  A review of the VA records reveal that while the VA doctors diagnosed Plaintiff with depression with psychotic features, none of them found any evidence of such features.  See supra. For instance, in July 2002, Dr. Abston found no evidence of delusions, ideas of reference, obsessions, compulsions, illusions or anxiety on Plaintiff's behalf.  Id. Likewise, none of the medical consultants who examined Plaintiff found any evidence of psychotic features.  Id. For example, Dr. McCleary evaluated Plaintiff in April 2002, and opined that although Plaintiff alleged hearing voices because she wakes up talking to someone, the "hallucinations" were only dreams and she showed "no evidence of delusional ideation or confusion."  Id. Moreover, as correctly noted by the ALJ, Plaintiff reported that she does not hear voices when the television is off, and that

her psychosis is alleviated with medication.[10]   (Tr. 23).

Accordingly, the undersigned finds that the ALJ did not err in

rejecting the VA's finding that Plaintiff has psychotic features

in light of the substantial record evidence.

Likewise, the ALJ did not err in determining that Plaintiff

does not have an impairment (or combination of same) that meets

or equals an impairment in the Listing.  (Tr. 23).  The ALJ

noted, as a threshold matter, that the State Agency did not

believe that any listing had been met or equaled and concluded

that "[t]here are no medical findings based on medically

acceptable clinical and laboratory techniques that show a

listing was met or equaled and that the duration requirement was

met."  (Id.)  The ALJ then specifically addressed Plaintiff's

claim that her mental impairment meets Listing 12.04, stating

that such an argument:

> is unsubstantiated by the totality of the *objective*
> clinical findings and that the claimant's alleged
> symptoms, since they are incredible, cannot be blindly
> applied to Section 12.04 and cannot warrant a finding
> of disabled at this step.  Through inconsistent
> statements made to examining psychologists, and her

---

[10]The ALJ also noted that Plaintiff's allegations of
hallucinations are suspect because her credibility was severely
eroded by repeated instances of her providing inconsistent
information. (Tr. 23).  For instance, at one point, Plaintiff
represented that she had no friends and had difficulty relating to
others, yet later reported that her friends pay her bills and that
she sometimes drinks when certain friends come to visit. (Id. at
24).

in[c]onsistent testimony, the claimant's credibility
in this matter has become severely diminished.

(Id. (emphasis in original)).

The Listing for Affective Disorders is as follows:

**12.04   Affective Disorders**: Characterized by a
disturbance of mood, accompanied by a full or partial
manic or depressive syndrome.  Mood refers to a
prolonged emotion that colors the whole psychic life;
it generally involves either depression or elation.

The required level of severity for these disorders is
met when the requirements in both A and B are
satisfied.

A.   Medically   documented   persistence,   either
     continuous or intermittent, of one of the
     following:

1.   Depressive syndrome characterized by at least four of
     the following:

          a.   Anhedonia or pervasive loss of interest
               in almost all activities;  or
          b.   Appetite disturbance with change in
               weight;  or
          c.   Sleep disturbance;  or
          d.   Psychomotor agitation or retardation;  or
          e.   Decreased energy;  or
          f.   Feelings of guilt or worthlessness;  or
          g.   Difficulty concentrating or thinking;  or
          h.   Thoughts of suicide;  or
          i.   Hallucinations, delusions or paranoid thinking;
               or

2.   Manic syndrome characterized by at least three of the
     following:

          a.   Hyperactivity;  or
          b.   Pressure of speech;  or
          c.   Flight of ideas;  or
          d.   Inflated self-esteem;  or
          e.   Decreased need for sleep;  or
          f.   Easy distractibility;  or

24

g. Involvement in activities that have a high probability of painful consequences which are not recognized; or

h. Hallucinations, delusions or paranoid thinking; or

3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); or

4. Repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors). 20 C.F.R. Pt. 404, Subpt. P, App. 1.

Assuming arguendo that Plaintiff meets the requirements of Part A, the record is totally devoid of any evidence that suggests, let alone demonstrates, that she can meet the requirements of Part B.   Simply put, Plaintiff has not referenced, and the Court has not found, any evidence that demonstrates that she has marked restrictions in activities of daily living, marked difficulties in maintaining social functioning, or deficiencies of concentration, persistence, or

pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere) or repeated episodes of deterioration or decompensation in work or work-like settings. As correctly determined by the ALJ, Plaintiff's allegations regarding her mental status (<u>i.e.</u>, Listing 12.04) lack credibility, and the record evidence supports a conclusion that her depression is managed with prescription medication and does not meet Listing 12.04.

**V.   Conclusion**

Based upon the foregoing and after careful consideration of the administrative record and memoranda of the parties, it is respectfully recommended that the decision of the Commissioner of Social Security denying Plaintiff's claim for disability insurance benefits and supplemental security income, be **AFFIRMED.**

The attached sheet contains important information regarding objections to this <u>report and recommendation</u>.

**DONE** this **21st** day of **September 2005**.

                              /s/ SONJA F. BIVINS
                     **UNITED STATES MAGISTRATE JUDGE**

26

**MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS
AND RESPONSIBILITIES FOLLOWING RECOMMENDATION
AND FINDINGS CONCERNING NEED FOR TRANSCRIPT**

1.   **Objection**.  Any party who objects to this recommendation or anything in it must, within ten days of the date of service of this document, file specific written objections with the clerk of court.  Failure to do so will bar a de novo determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the magistrate judge.  See 28 U.S.C. § 636(b)(1)(c); and Lewis v. Smith, 855 F.2d 736, 738 (11th Cir. 1988).  The procedure for challenging the findings and recommendations of the magistrate judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides, in part, that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten days after being served with a copy of the recommendation, unless a different time is established by order.  The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.  The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed de novo and a different disposition made.  It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.  Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.   **Opposing party's response to the objection.**  Any opposing party may submit a brief opposing the objection within ten (10)

days of being served with a copy of the statement of objection. <u>See</u> Fed. R. Civ. P. 72; SD ALA LR 72.4(b).

3.      **<u>Transcript (applicable where proceedings tape recorded)</u>**. Pursuant to 28 U.S.C. § 1915 and Fed.R.Civ.P. 72(b), the magistrate judge finds that the tapes and original records in this action are adequate for purposes of review.   Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

                          **/s/ SONJA F. BIVINS**
                          **UNITED STATES MAGISTRATE JUDGE**